[No. A125924. First Dist., Div. Four. Feb. 23, 2011.]

JOSEPH A. BONFIGLI et al., Plaintiffs and Appellants, v.
ALAN F. STRACHAN et al., Defendants and Respondents.

■■■■■■■■■

COUNSEL

O'Brien, Watters & Davis, Michael G. Watters and Deirdre Taber Kingsbury for Plaintiffs and Appellants.

Strachan & Strachan and Gordon C. Strachan for Defendant and Respondent Alan F. Strachan.

Smith Dollar, Rachel M. Dollar and Heather Bussing for Defendant and Respondent Michael D. Smith.

OPINION

RIVERA, J.—Joseph A. and Helen I. Bonfigli appeal from an amended judgment upon a special verdict in favor of respondent developers Alan F. Strachan and Michael D. Smith. The Bonfiglis contend that the trial court erred (1) in its pretrial ruling on the validity of a special durable power of attorney executed by the parties; (2) in directing a verdict against them on their cause of action for financial elder abuse; and (3) in certain evidentiary matters. We reverse.

## I. FACTUAL BACKGROUND

In 1972, the Bonfiglis purchased approximately six acres of property located at 3945 Sebastopol Road in Santa Rosa. The property was made up of two parcels. The back parcel was about 4.72 acres, and the Bonfiglis lived in a house located on that parcel. The other parcel fronted on Sebastopol Road.

In the early 1990's, respondents began planning a large residential and commercial development project called Courtside Village. Strachan was responsible for dealing with the landowners whose properties were necessary to the development. Smith dealt with the actual construction of the project. Strachan first approached the Bonfiglis in 1990. In 1991, the Bonfiglis entered into an option agreement with the Countryside Racquets Club Development Ltd. (CRCDL) providing CRCDL with the option to purchase their Sebastopol Road property. The option terms included a $1.22 million purchase price for the property and monthly payments of $1,000 as consideration to the Bonfiglis for removing the property from the market. The option terminated in 1996 without being exercised.

In 1996, Strachan, on behalf of Courtside Village, L.P. (CVLP), negotiated with the Bonfiglis to purchase the property. CVLP purchased the back parcel for $600,000. CVLP initially promised to pay an additional $150,000 to the

Bonfiglis when the first parcel was purchased, but this agreement was not reduced to writing. Instead, CVLP secured a new option in November 1996 to purchase the front parcel for $750,000, with the option expiring on July 1, 2001, and requiring that CVLP make monthly payments of $2,000 to the Bonfiglis in consideration for the option.[1] At the same time, the Bonfiglis executed a special durable power of attorney (POA) "coupled with an interest" in favor of CVLP, with respect to both parcels of the property. The POA granted to CVLP the right to rent, encumber, grant easements, execute subdivision maps, and "do all other things necessary or appropriate to carry out the development of the [Bonfiglis'] Property in accordance with attorney in fact's current or future development plans for the Property."

CVLP made the option payments until sometime in 1999. In May 2000, CVLP assigned the option to CVLLC. Strachan and Smith were the co-managers of CVLLC. Also, in May 2000, the Bonfiglis executed a new special durable power of attorney—with essentially the same provisions—appointing CVLLC as its attorney in fact for the period April 1, 2000, to September 30, 2003, concerning the property (the 2000 POA). A month later, on June 22, 2000, CVLLC assigned the option to Courtside Construction Company, LLC (CCCLLC), at no cost to CCCLLC. The parties stipulated that CCCLLC did not obtain a power of attorney from the Bonfiglis in connection with the option. The option expired on July 1, 2001, without being exercised. Respondents needed the Bonfiglis' parcel in order to develop the overall project, and specifically, the "Village Square" portion of the development.

In May 2001, respondents filed a lot line adjustment application with the City of Santa Rosa on behalf of "Courtside Construction Company" and the Bonfiglis. Strachan signed the application for CCCLLC and Smith signed as attorney in fact for the Bonfiglis. The reason given for the lot line adjustment was to "[r]econfigure lot line as desired by property owners." The requested adjustment decreased the size of the Bonfiglis' front parcel by approximately 60 percent, from 1.23 acres to 0.52 acres and increased the size of CCCLLC's parcel from 0.37 acres to 1.08 acres. The lot line adjustment was completed in the fall of 2002, after the option on the Bonfiglis' front parcel had expired. At the time, none of the respondents' entities had any proprietary interest in the Bonfiglis' front parcel.

Respondents sought the lot line adjustment in order to conform the lots to the tentative map that had been approved by the City of Santa Rosa, and to

---

[1] The original option was actually taken in the name of a different entity, also controlled by Strachan and Smith, Courtside Village, LLC (CVLLC). The rights under this option were assigned to CVLP two weeks later. The assignment and the power of attorney were recorded on December 10, 1996. Accordingly, as of December 10, 1996, CVLP held both the option on the Bonfiglis' parcel and the Bonfiglis' power of attorney.

create a buildable parcel. CVLLC, through its managers Strachan and Smith and acting as the Bonfiglis' attorney in fact, effected the transfer of 0.71 acres from the Bonfiglis to CCCLLC in October 2002. Respondents did not pay the Bonfiglis for the transfer nor did they ever purchase the front parcel. Respondents consistently took the position that the lot line adjustment increased the value of the Bonfiglis' parcel, although Smith admitted that the Bonfiglis never received the full $750,000 respondents had agreed to pay them.

In October 2002, CCCLLC executed a $22.6 million loan agreement with Comerica Bank. The Bonfiglis' parcel, among others, was used as collateral for the loan, with respondents signing as attorneys in fact for the Bonfiglis on behalf of CVLLC. The subordination agreement executed in connection with the loan referred to the Bonfiglis as optionor and to CCCLLC as optionee, even though the option had expired. According to Mrs. Bonfigli, the Bonfiglis did not know about the loan or the lot line adjustment until 2003, after CVLLC filed for bankruptcy. Strachan stated that he met with the Bonfiglis about the lot line adjustment after it took place in 2002.

Michael Ryan, respondents' expert in real estate development, testified that once the tentative map for the development was approved in 1995, the Bonfiglis' property was worth $10 million. He valued the front parcel at a little bit more than $2.5 million.[2] Ryan also testified that when an option is transferred, generally a new power of attorney is executed on behalf of the new optionee.

In January 2003, CVLLC filed for bankruptcy. The Bonfiglis eventually sold the 0.52-acre front parcel to Menlo Oaks, one of the entities that owned and managed CCCLLC, for $550,000. At the time, CCCLLC was in the process of restructuring the October 2002 loan on the property that respondents had executed as attorneys in fact for the Bonfiglis. The Bonfiglis were told there was no choice but to cooperate in restructuring the loan because it was in default and the restructuring would allow them the time needed to resolve the issues with the property. The fact that the property was encumbered affected the purchase price the Bonfiglis were able to negotiate.

The Bonfiglis filed this action in October 2006 for fraud, concealment, false promises, breach of fiduciary duty, trespass, and financial elder abuse. Prior to trial, the Bonfiglis moved for a preliminary determination of the

---

[2] Howard Levy, a real estate appraiser, valued the Bonfiglis' 0.52-acre front parcel at $2.22 million to $2.385 million in April 2004, assuming that the land would be used for 33 buildable units. Plaintiffs' expert, Robin Erdmann, testified that in 2002 the value of the Bonfiglis' entire front parcel was $1.23 million, and the value of the 0.52-acre parcel created by the lot line adjustment was $550,000. Erdmann testified the 0.52-acre parcel was worth $610,000 in 2004.

effect of the powers of attorney and option agreements. They sought a ruling that the special durable power of attorney dated May 5, 2000, did not grant any authority for a lot line adjustment on their property. They also asked the court to rule that the power of attorney terminated when CVLLC assigned the option to CCCLLC and the parties did not execute a power of attorney in favor of CCCLLC, i.e., that the 2000 POA expired when it was no longer coupled with an interest. The court ruled that the special durable power of attorney was coupled with an interest, that interest being the option agreement to purchase the front parcel. The court also concluded that upon assignment of the option, the power of attorney was no longer coupled with an interest but was converted to a "general power of attorney" with CVLLC owing fiduciary duties to the Bonfiglis.

Before the case went to the jury, the court granted respondents' motion for a directed verdict on the financial elder abuse cause of action, finding that there was no evidence of the gravamen of the claim. The remaining claims went to the jury. The jury found against the Bonfiglis.

## II.  DISCUSSION

### A.  *Instructional Error*

The court instructed the jury not only that the power of attorney did not prohibit lot line adjustments but also that a valid power of attorney was in effect when the lot line adjustment was made. The court instructed as follows: "An attorney-in-fact under a power of attorney has no authority to take any action beyond those directly authorized by the grantor of the power of attorney or actions necessary and proper to carry out what was directly authorized by the grantor. [¶] The Court has ruled in this case that the powers of attorney did not prohibit lot line adjustments. [¶] A power of attorney conferring authority to sell, exchange, transfer or convey real property does not authorize a conveyance without consideration. [¶] In pre-trial motions before the Court, the Court determined that the power of attorney was the [*sic*] power coupled with an interest and there were no fiduciary duties owed to the plaintiff until the option was assigned from CV-LLC to CCC on June 16, 2000. [¶] *After the option was assigned to CCC, the power of attorney remained in effect under its own terms through September 30, 2003*. However, because the power of attorney was no longer a power coupled with an interest, CV-LLC then had a fiduciary duty to plaintiffs in accordance with Probate Code Section 4230(c) which states, 'If an attorney-in-fact has expressly agreed in writing to act for the principal, the attorney-in-fact has a duty to act pursuant to the terms of the agreement. The agreement to act on

behalf of a principal is enforceable against the attorney-in-fact as a fiduciary.' " (Italics added.) The Bonfiglis contend that the trial court erred in its ruling on the effect of the power of attorney and in its instructions to the jury on the issue. We agree.

### 1. *What Is a Power Coupled with an Interest*

"California decisional law has consistently followed the definition of [a power coupled with an interest] set out by Chief Justice Marshall in *Hunt* v. *Rousmanier* (1823) 21 U.S. (8 Wheat.) 174, 203 [5 L.Ed. 589]: ' "A power coupled with an interest," is a power which accompanies, or is connected with, an interest. The power and the interest are united in the same person.' [Citation omitted.]" (*Pacific Landmark Hotel, Ltd. v. Marriott Hotels, Inc.* (1993) 19 Cal.App.4th 615, 624 [23 Cal.Rptr.2d 555] (*Pacific Landmark Hotel*).) Such a power is irrevocable if there is a " 'coexisting interest in the subject of the agency.' " (*Ibid.*, quoting *Capital Nat. Bk. of Sacramento v. Stoll* (1934) 220 Cal. 260, 264 [30 P.2d 411].) " 'The agency must be created for the benefit of the agent in order to protect some title or right in the subject of the agency or secure some performance to him. [Citation.]' " (*Pacific Landmark Hotel*, at p. 625.)

Because the purpose of a power coupled with an interest is to protect the *agent's* interest in the subject and its value, this kind of power of attorney is not an "agency" as that term is commonly understood. Rather, the creator of the power relinquishes irrevocably any authority to direct the attorney in fact who is permitted, under such an arrangement, to act solely in his own interests. As is explained in the Restatement Third of Agency, section 3.12, comment b, page 247, a "power given as security does not create a relationship of agency . . . because it is neither given for, nor exercised for, the benefit of the person who creates it. The holder is not subject to the creator's control and the holder does not owe fiduciary duties to the creator."[3]

### 2. *What Is the Interest to Which the POA Was Coupled*

The parties do not dispute that the 2000 POA was coupled with an interest. They do, however, disagree as to the "interest" to which it was coupled.

---

[3] The Restatement uses the phrase "power given as security" to describe "a power to affect the legal relations of its creator that is created in the form of a manifestation of actual authority and held for the benefit of the holder or a third person." (Rest.3d Agency, *supra*, § 3.12, p. 246.) A "power coupled with an interest" is a subset of a "power given as security" because, as we have noted, it also requires that the holder of the power possess a proprietary interest in the subject matter of the agency *and* that the power and the interest be united in the same person. (*Id.*, com. c, pp. 249–250; see also *Lane Mortgage Co. v. Crenshaw* (1928) 93 Cal.App. 411, 428 [269 P. 672] (*Lane Mortgage*).)

The Bonfiglis argue, and the trial court concluded, that the 2000 POA was coupled with respondents' (CVLLC's) option on their property. Respondents contend that the interest was not CVLLC's interest in the option, but respondents' interest in completing the entire development. They argue that the power "is designed to 'protect some title or right in the subject of the agency or secure some performance to (the agent).' [Citation.] Here, the subject of the agency was the Courtside Village development and the power coupled with an interest was designed to protect the developer's rights to develop the project and to secure the performance of the Bonfiglis in permitting their property to be developed."

We agree with the trial court's conclusion that the interest with which the 2000 POA was coupled was the option held by CVLLC to purchase the Bonfiglis' parcel. By its terms the "subject of the agency" was not the entire development; rather the POA gave to respondents "the right to carry out [development activities] *concerning the real property* [owned by the Bonfiglis]." (Italics added.) Indeed the power of attorney could not grant to respondents any interest in—or power over—the Courtside Village development because the Bonfiglis had no such interest or power to give. As respondents correctly state, the powers granted to them under the POA "relate to the property itself" and gave to respondents the "power to use *the land* to develop the project." (Italics added.) The interest being protected is the right to purchase the property at a specified price; and the value of that interest was secured by respondents' ability to control the property for development purposes.

This analysis is borne out in *Lane Mortgage*. There, as part of a financing transaction to construct an office building, Lane Company was granted a 20-year rent-free lease on the entire second floor of a building and, at the same time, was given a 20-year management contract for the new building. (*Lane Mortgage, supra*, 93 Cal.App. at pp. 417–419.) The question before the court was whether the "power" (the management agreement) was irrevocable as one coupled with an "interest" (the 20-year lease). The court concluded that it was, reasoning that the value of Lane Company's leasehold interest could only be secured by its power to control the management of the building. The exclusive agency thus gave to Lane Company the ability to protect its leasehold against devaluation in the event "the building [would be] used for any purpose calculated to injure the premises, or by reason of any unlawful use, or through the building becoming in a state of dilapidation or unsafety." (*Id.* at pp. 426–427.) "The powers granted the Lane Company in their total amount to no more than placing in the hands of the company directly the means of preserving its said interest." (*Id.* at pp. 428–429.)

Similarly, here, respondents as developers understood that the development could not occur without the Bonfiglis' property and so they acquired an

option to purchase the property for $750,000. The value of that interest was then secured by obtaining from the Bonfiglis the unfettered authority to use the property to advance the development. Accordingly, to paraphrase *Lane Mortgage*, the powers granted to CVLLC, and indirectly to Strachan and Smith, amount to no more than placing in their hands the means of preserving the value of their option.[4]

### 3. *What Is the Legal Effect of Decoupling the Power from the Interest*

It is undisputed that CVLLC assigned the option to CCCLLC in June 2000, and that the parties did not execute a new POA in favor of CCCLLC. The trial court concluded that this decoupling of CVLLC's interest from its 2000 POA did not terminate the POA, but transformed the irrevocable power-coupled-with-an-interest, held for the benefit of the holder, to a revocable general power of attorney, held for the benefit of the creator and subject to fiduciary duties. The court so instructed the jury. The Bonfiglis contend this was error; they argue that a power coupled with an interest is terminated by operation of law once the holder's interest in the property is extinguished.

We can find no California authority directly on point. We turn, therefore, to the Restatement Third of Agency, *supra*, section 3.13, page 258, which sets forth the following principle, as relevant here: "A power given as security or an irrevocable proxy is terminated by an event that [¶] (a) discharges the obligation secured by the power or terminates the interest secured or supported by the proxy . . . ." The commentary to this section explains under what circumstances a power given as security will terminate: "[A] power given as security or an irrevocable proxy is by definition tied to or supported by an interest or obligation that differentiates the power or proxy from a relationship of agency. Duration of the power or proxy is thus coterminous with such interest or obligation, with the consequence that terminating the interest or obligation terminates the power or proxy as well. . . . If the

---

[4] At oral argument respondents made an alternative argument that the POA coupled with an interest remained in effect after the option expired because, although CVLP owned the back parcel outright, the Bonfiglis had a leasehold interest in it and lived there until 2004. Respondents contended this was a secondary ground for the trial court's determination that the 2000 POA did not expire, i.e., that it was needed for CVLP to exercise power over the leasehold. We note, first, that contentions raised on appeal for the first time at oral argument are generally waived. (*Lyons v. Chinese Hospital Assn.* (2006) 136 Cal.App.4th 1331, 1336, fn. 2 [39 Cal.Rptr.3d 550].) In any event, the contention has no merit. The 2000 POA was not needed to exercise any power over the back parcel from or after November 1999 (when the written lease expired), or to overcome any rights of the Bonfiglis in the leasehold, because the lease itself retained for the lessor "the right to make any improvements to the property as are necessary pursuant to the construction of the subdivision." The lease further provided that "[s]hould any work activity of Lessor disturb Lessee, then Lessee's sole and exclusive remedy is to vacate the premises."

creator grants the power to protect an ownership interest of the holder, the power terminates when the holder no longer has the ownership interest." (*Id.*, com. b, p. 259.)

We agree with the Restatement's analysis. Given the unusual nature of a power coupled with an interest—in that it is not a true agency because the power is not controlled by the principal nor is it required to be exercised in the interest of the principal—we conclude that the power is not merely revocable upon extinction of the interest, but is itself extinguished at the time the interest in the subject matter terminates.[5] This result is consistent with the requirement that, for a power to be coupled with an interest, the same person or entity must hold both the power of attorney and the underlying interest. (*Pacific Landmark Hotel, supra,* 19 Cal.App.4th at p. 624.) "[T]he test derived from *Hunt*[, *supra,* 21 U.S. at page 203] requires that the same person hold both the interest and the power. As a consequence, it does not recognize the irrevocability of a power created in one person when the creator transfers the requisite proprietary interest to another person, even if the holder and the transferor are closely related, such as affiliated corporations in the same group." (Rest.3d Agency, *supra,* § 3.12, com. c, p. 250.)[6]

The trial court's conclusion that the powers authorized by the 2000 POA continued until its date of termination, but in a different *form,* i.e., as a general power of attorney to be exercised for the benefit of the principal, has some pragmatic appeal. It is not, however, supported by any authority. Further, we think a rule that automatically transforms a special durable power coupled with an interest—which is exercised in the holder's interest—into a general power that is exercised in the creator's interest with all attendant fiduciary obligations, is unworkable. Such a transformation fundamentally alters the nature of the power and the relationship of the parties, not to mention the terms of the agreement and applicable law. The result would be fraught with uncertainties. As only one example, a POA coupled with an interest commonly authorizes the holder to deal with the creator's property for the holder's own profit (as did the Bonfiglis' POA). But the law governing general powers of attorney requires the holder to act "solely in the interest of the principal." (Prob. Code, § 4232, subd. (a).) Suppose the holder—now agent—takes an action that generates a dispute; which law governs? The creator—now principal—will rely upon Probate Code section

---

[5] The question of *third party* reliance on a recorded power of attorney that has been automatically terminated by decoupling of the holder's interest in the subject matter of the power is not before us. Presumably, the creator of the power could be held liable for unauthorized contracts entered into by the holder unless there was adequate notice of the termination of the power. (Prob. Code, §§ 4150, subd. (b), 4151, subd. (b), 4300 et seq.)

[6] This was also the escrow officer's understanding. At trial, Leslie Hudson acknowledged that in order for the attorney in fact's signature on documents to be valid after the assignment of an option, a new power of attorney would be needed in the name of the new optionholder.

4232, while the agent will point to the language of the POA and to section 4101 which allows the principal to limit application of the statute by express statement in the instrument (as respondents have argued here). In short, the terms of a POA coupled with an interest granting unfettered authority over the property in which it holds the interest simply cannot be squared with the legal obligations of an agent under a general power of attorney.

We therefore follow the principle enunciated in the Restatement, and hold that a special power of attorney coupled with an interest in property is terminated upon extinguishment of the interest.

### 4. *Application of Law to This Case*

The following sequence of events is not disputed: CVLLC assigned the option to CCCLLC on June 22, 2000. CCCLLC, the new holder of the option never obtained a power of attorney from the Bonfiglis. In May 2001, CVLLC applied for a lot line adjustment using the 2000 POA. In July 2001, the option expired without being exercised. In October 2002, CCCLLC effectuated the lot line adjustment and encumbered the Bonfiglis' property with a new loan, using the 2000 POA.

As the duration of the power of attorney is coterminous with the ownership interest in the property, when CVLLC assigned the option to CCCLLC without CCCLLC obtaining a new power of attorney, neither entity had any authority to utilize the 2000 POA to make a lot line adjustment in 2002. (Rest.3d Agency, *supra*, § 3.13, com. b, p. 259.) In sum, the 2000 POA was extinguished upon the assignment of the option to CCCLLC in June 2000.

The case went to the jury based on the trial court's rulings that a valid power of attorney was in existence when the lot line adjustment was made. The 2000 POA, however, was invalid, as were respondents' signatures on the documents they signed in connection with the lot line adjustment.[7] Thus, the jury was essentially instructed that the lot line adjustment was permitted by the 2000 POA and that the 2000 POA was valid. With those instructions in place, the jury was in effect told that respondents were authorized to effectuate the lot line adjustment, the precise act for which the Bonfiglis' sought to hold them liable.

Respondents argue that the Bonfiglis invited the error because following the court's determination on the effect of the power of attorney and the

---

[7] The application for a lot line adjustment was signed by CCCLLC and by respondents as attorneys in fact for the Bonfiglis. The grant deed implementing the actual transfer of the Bonfiglis' property was signed by CVLLC, apparently utilizing the 2000 POA, at the time the deed was executed in October 2002. But the 2000 POA was invalid, as it terminated upon CVLLC's assignment of the option to CCCLLC.

option, they argued to the jury that respondents breached their fiduciary duties under the 2000 POA. We conclude that the invited error doctrine is inapplicable here.

■ The invited error doctrine is an application of the estoppel principle: "Where a party by his or her conduct induces the commission of error, the party is estopped from asserting it as a ground for reversal. . . . [Citations.]" (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 389, p. 447.) "At bottom the doctrine rests on the purpose of the principle, which is to prevent a party from misleading the trial court and then profiting therefrom in the appellate court. [Citations.] In light of this principle, . . . the doctrine has not been extended to situations wherein a party may be deemed to have induced the commission of error, but did not in fact mislead the trial court in any way—as where a party ' " 'endeavor[s] to make the best of a bad situation for which [it] was not responsible.' " ' [Citation.]" (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403 [87 Cal.Rptr.2d 453, 981 P.2d 79], citation omitted; see also *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212 [285 Cal.Rptr. 99, 814 P.2d 1341] [doctrine of invited error does not apply where a party, while making the appropriate objections, acquiesces in a judicial determination].)

Here, the court's ruling on the effect of the assignment and the expiration of the option on the 2000 POA required the Bonfiglis to adapt their theory of the case to fit with the court's ruling that a valid power of attorney continued in effect despite the expiration of the option. There was no invited error.

We also conclude the court's instructional error was prejudicial. "Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 [34 Cal.Rptr.2d 607, 882 P.2d 298].) Here, the jury was told, in essence, that the 2000 POA was valid and authorized the lot line adjustment. The instructional error was pivotal and foreclosed the Bonfiglis' theory that respondents lacked the authority to transfer their property to CCCLLC. They were left with the virtually insurmountable task of arguing that respondents breached their fiduciary duty under the 2000 POA in effecting the lot line adjustment even though the court instructed the jury that the 2000 POA authorized lot line adjustments and that the 2000 POA was valid. Under the circumstances, we cannot conclude the instructional error was harmless. In light of the record as a whole, the result upon retrial may be the same. It is nevertheless reasonably probable that the Bonfiglis would have achieved a more favorable result had the jury been properly instructed.[8]

---

[8] Having reached this conclusion, we need not address the Bonfiglis' argument concerning their fraud cause of action, as the jury's determination on that claim was necessarily affected by the erroneous jury instructions on the 2000 POA.

B. *Directed Verdict on Financial Elder Abuse Claim*

The Bonfiglis argue that the trial court erred in directing a verdict against them on the financial elder abuse cause of action.

"A directed verdict may be granted only when, disregarding conflicting evidence, giving the evidence of the party against whom the motion is directed all the value to which it is legally entitled, and indulging every legitimate inference from such evidence in favor of that party, the court nonetheless determines there is no evidence of sufficient substantiality to support the claim or defense of the party opposing the motion, or a verdict in favor of that party. [Citations.]" (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 629–630 [85 Cal.Rptr.2d 386].) On appeal, we decide de novo whether sufficient evidence was presented to withstand a directed verdict. (*Magic Kitchen LLC v. Good Things Internat., Ltd.* (2007) 153 Cal.App.4th 1144, 1154 [63 Cal.Rptr.3d 713].)

■ Financial abuse of an elder adult "occurs when a person or entity does any of the following: [¶] (1) Takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both. [¶] (2) Assists in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both." (Welf. & Inst. Code, § 15610.30, subd. (a).)

The Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, § 15600 et seq.) was enacted to provide for the "private, civil enforcement of laws against elder abuse and neglect" (*Delaney v. Baker* (1999) 20 Cal.4th 23, 33 [82 Cal.Rptr.2d 610, 971 P.2d 986]). The statutory provisions are not limited to mentally incompetent or physically impaired elders, or persons of limited financial means. (Welf. & Inst. Code, §§ 15600, 15610.27, 15610.30.) Under the statute, it is not necessary that the taker maintain an intent to defraud if it can be shown that the person took the property for a wrongful use and "knew or should have known that [his or her] conduct is likely to be harmful to the elder . . . ." (*Id.*, § 15610.30, subd. (b).)[9]

The trial court granted respondents' motion for a directed verdict, finding that "[t]he gravamen of that offense is not something that the Court sees any

---

[9] Subdivision (b) of section 15610.30 of the Welfare and Institutions Code provides: "A person or entity shall be deemed to have taken, secreted, appropriated, obtained, or retained property for a wrongful use if, among other things, the person or entity takes, secrets, appropriates, obtains, or retains the property and *the person or entity knew or should have known that this conduct is likely to be harmful to the elder or dependent adult.*" (Italics added; see also CACI No. 3100.)

evidence here fulfilling. [¶] And the Court would not believe that there is any clear and convincing evidence of any level required for the enhanced remedy." The court's remarks at the hearings[10] on the issue reflect that the court was concerned about how the case fit within the definition of elder abuse, noting that there was no definition of "harm" in the CACI instruction. The court also found that the lot line adjustment was not a taking "as envisioned in the statute defining elder abuse law," and that "under [the Bonfiglis'] reasoning, every breach of contract in which a contracting party didn't pay the other party or happened [to be] over 65 would be an elder abuse case . . . ."

If the court's ruling on the validity of the 2000 POA had been correct, we would not disturb the court's ruling on the directed verdict. We have concluded, however, that the respondents effected the lot line adjustment and encumbered the Bonfiglis' property without a valid power of attorney. Further, the parties do not dispute that the Bonfiglis, who were over 65 at the time of the lot line adjustment, were elders within the meaning of the statute.[11] Finally, the evidence showed that respondents never paid the Bonfiglis for any portion of the front parcel. These facts comprise at least a skeletal claim for elder abuse.

Respondents argue that the court properly entered a directed verdict because the Bonfiglis cannot demonstrate a fraudulent taking of the front parcel inasmuch as the jury found that respondents did not commit fraud. The jury, however, was erroneously instructed; hence, we cannot conclude that it would not have found fraud on the evidence before it or that the jury would not have found that the property was taken for a "wrongful use" within the meaning of the statute had there been no instructional error.

To the extent respondents continue to assert that the financial elder abuse claim requires a finding that the Bonfiglis suffered mental suffering, they are mistaken. The statute does not require a finding of mental suffering. Rather, the statute requires a finding that the defendant took the property for "a wrongful use or with intent to defraud, or both." (Welf. & Inst. Code, § 15610.30, subd. (a)(1).) While cases may be brought under the elder abuse statute alleging mental suffering (see *id.*, § 15610.07), the Bonfiglis did not do so, nor did they allege emotional distress or seek damages for pain and suffering. Consequently, they were not required to offer evidence of mental suffering to support their claim of financial elder abuse. Because we conclude that the court's pretrial ruling on the power of attorney issue resulted in

---

[10] The Bonfiglis moved for reconsideration of the court's ruling on the motion.

[11] Helen was 69 and Joe was 74 or 75 in October 2002 when the lot line adjustment was completed. An elder is defined as "any person residing in this state, 65 years of age or older." (Welf. & Inst. Code, § 15610.27.)

erroneous jury instructions and permeated the entire trial, we reverse the court's ruling on the directed verdict motion.

## C. *Evidentiary Issue*

The Bonfiglis also contend that the trial court erroneously limited their cross-examination of respondents when respondents claimed they signed documents only after they were reviewed by counsel. We need not decide the question. While the issue may arise on retrial, the court's ruling on the validity of the power of attorney impacted its evidentiary rulings on respondents' assertion of the attorney-client privilege. Hence, it is impossible to determine whether any privileged communications will be placed at issue in the case upon retrial. (See *2,022 Ranch v. Superior Court* (2003) 113 Cal.App.4th 1377, 1395 [7 Cal.Rptr.3d 197] [attorney-client privilege may be waived by placing contents of the privileged communications at issue in the case], disapproved on other grounds in *Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 739 [101 Cal.Rptr.3d 758, 219 P.3d 736].)[12]

## D. *Respondents' Alternative Grounds for Affirmance*

Respondents contend that the judgment should be affirmed regardless of the asserted errors because the jury found they had no fraudulent intent in securing the lot line adjustment. We have already concluded that the pretrial ruling on the power of attorney issue and the erroneous jury instructions permeated the entire trial. The question of respondents' intent must be examined in the proper legal context.

■ Respondents also contend the judgment can be affirmed on the ground that the jury found they were not "personally . . . attorney[s]-in-fact for Helen and Joe Bonfigli pursuant to the May 5, 2000 power of attorney." According to respondents, the only entity liable for any alleged misuse of the 2000 POA would be CVLLC or CCCLLC. Respondents, however, cannot escape potential liability by using their business entity as a shield. " '[A]n officer or director will not be liable for torts in which he does not personally participate, of which he has no knowledge, or to which he has not consented.' " (*Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 503 [229 Cal.Rptr. 456, 723 P.2d 573].) However, directors or officers *are* liable to third persons who are "injured by their own tortious conduct

---

[12] Respondents contend that the Bonfiglis' action is barred by the statute of limitations. They, however, did not file a cross-appeal. Generally, a respondent must file his own appeal in order to obtain affirmative relief by way of appeal. (Code Civ. Proc., § 906; *Building Industry Assn. v. City of Oceanside* (1994) 27 Cal.App.4th 744, 758, fn. 9 [33 Cal.Rptr.2d 137].) In any event, respondents fail to demonstrate that the issue is meritorious. We note that the trial court denied their motion for a directed verdict on the issue.

regardless of whether they acted on behalf of the corporation and regardless of whether the corporation is also liable. . . . This liability does not depend on the same grounds as 'piercing the corporate veil,' on account of inadequate capitalization for instance, but rather on the officer or director's personal participation or specific authorization of the tortious act." (*Id.* at p. 504, citations omitted.) "The reason for this rule is that otherwise, a director could inflict injuries upon others and then escape liability behind the shield of his or her representative character, even though the corporation might be insolvent or irresponsible. [Citations.]" (*Id.* at p. 505; see also *People v. Pacific Landmark, LLC* (2005) 129 Cal.App.4th 1203, 1212–1216 [29 Cal.Rptr.3d 193].)

### III. DISPOSITION

The judgment is reversed and the matter is remanded for further proceedings consistent with this opinion. The Bonfiglis shall recover their costs on appeal.

Ruvolo, P. J., and Reardon, J., concurred.

A petition for a rehearing was denied March 24, 2011, and the opinion was modified to read as printed as above.