Filed 6/23/14  Wynn v. Francis CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| STEPHEN A. WYNN, | B245401 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC438884) |
| v. | |
| JOSEPH RAYMOND FRANCIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment, permanent injunction, and order of the Superior Court of Los Angeles County, Joanne B. O'Donnell, Judge.  Affirmed.

Ronald D. Tym for Defendant and Appellant.

Brownstein Hyatt Farber Schreck, Barry B. Langberg and Deborah Drooz for Plaintiff and Respondent.

Joseph Raymond Francis appeals from a judgment, permanent injunction and order denying his motion for judgment notwithstanding the verdict in this defamation action.

The primary issues on appeal concern applicability of the litigation privilege (Civ. Code, § 47, subd. (b) (section 47(b))) and the fair reporting privilege (Civ. Code, § 47, subd. (d) (section 47 (d))). The trial court granted a partial motion for directed verdict brought by plaintiff Stephen Wynn, finding these privileges did not apply. After the jury returned a verdict in favor of Wynn and against Francis, the court denied Francis's motion for judgment notwithstanding the verdict which was brought on the ground that his statements were privileged.

Francis also contests amendment of the complaint according to proof at trial to add a cause of action for defamation. The new cause of action was based on his repetition of the allegedly slanderous statement during an appearance he made on the ABC Network program Good Morning America, which occurred near the trial date in this action.

We find no basis for reversal, and affirm the judgment and orders from which the appeal is taken.


## FACTUAL AND PROCEDURAL SUMMARY

This case involves two well-known public figures. Wynn develops, owns interests in, and operates gambling casinos in Nevada, New Jersey and China. He is chairman of the board of Wynn Las Vegas. Francis gained notoriety for creating an adult entertainment enterprise which included "Girls Gone Wild" videos and DVD's which featured "young, and sometimes underage, women in states of partial or total nudity, and sometimes performing more explicit sex acts." (*Bullard v. MRA Holding, LLC* (N.D. Ga. 2012) 890 F.Supp.2d 1323, 1325, 1337.)

In 2007, Francis was extended a line of credit by the Wynn casino in Las Vegas, Nevada. He incurred gambling debts of about $2 million at the casino. He signed a "marker" in favor of the casino. The marker is a negotiable instrument similar to a check that can be deposited at a bank. The normal practice at the casino is to hold a marker for

30 days to allow the customer an opportunity to pay it off. Francis requested an extension of time to pay, which was granted.

Larry Altschul, executive vice president of player development at the casino, was responsible for establishing relationships with major gambling customers. He had established a relationship with Francis. After Francis incurred the $2 million dollar debt to the casino, Altschul had a number of conversations with him about holding the marker, which would delay its deposit, as a favor to Francis.

After more than a year, Altschul telephoned Francis and told him that he was going to have to pursue collection on the marker. Altschul testified: "He told me that I was making the biggest fucking mistake of my life. And I and the Wynn had no idea what was coming at us." Altschul took this as a threat. As of trial, the debt had not been paid.

Wynn Las Vegas sued for collection on the debt and obtained a judgment against Francis in Nevada for $2 million plus interest. It domesticated the judgment in California to enforce it against Francis, a California resident.[1] On April 12, 2010, Francis was scheduled to appear for a judgment debtor examination in the Los Angeles Superior Court. The record does not include a reporter's transcript of the proceedings for that day.

Attorney Mitchell Langberg was going to examine Francis on behalf of the Wynn interests in the judgment debtor proceeding. In his testimony in the present action, he said that prior to the examination, he and Dennis Russell, counsel for Francis, were in the courtroom. The debtor examination itself was to be held in another room. Russell indicated that he was aware that representatives of the media and attorneys in other cases involving Francis were present in the courtroom. He asked the commissioner presiding over the proceeding to exclude the media representatives and other attorneys from the

---

[1] According to his amended answer and cross-complaint in the present action, Francis counterclaimed in the civil marker action alleging that Wynn Las Vegas engaged in various improper or illegal activities including using alcohol and prostitutes to impair gamblers. This gave rise to a defamation action by Wynn Las Vegas and Wynn individually against Francis in Clark County, Nevada.

debtor's examination. Counsel and the court discussed the law regarding persons who may be present at a debtor's examination.

Langberg testified that in the middle of that conversation, Francis interrupted and started to say something which Langberg could not recall. The commissioner admonished Francis to address the court through his attorneys. Langberg said: "So it could have been . . . another 30 seconds or later so, Mr. Francis again just interrupted and just kind of spit out that Steve Wynn had threatened to kill him and have him hit over the head with a shovel and buried in the desert." This defamatory statement is the basis for one of the causes of action in the present action. We term it "the death threat statement."

According to Langberg, the commissioner "looked kind of shocked, surprised. And asked Mr. Francis if he had reported it to the police or sought a temporary restraining order." Francis said he had not, and asked "'Can I go do that now?'" The court said he could not. Up to that point in the proceeding, there had been no discussion of a restraining order. Instead, the entire conversation had been about the examination of Francis and whether other attorneys and reporters would be allowed to observe it.

Michael Amormino, who was employed by TMZ, attended the judgment debtor hearing. He identified TMZ as a celebrity website and television "show" specializing in celebrity news. Amormino was a court researcher with an office in the courthouse. He monitored ongoing cases, reviewing filings and attending hearings and trials. He gathered information and turned it over to the TMZ news desk, which then provided it to writers. He did not write stories himself.

Amormino did not recall whether other members of the press were in the courtroom on the day set for the judgment debtor examination. Attorneys who had unrelated cases against Francis also were present to attend the judgment debtor hearing. Francis and his counsel asked the court to clear the courtroom for the judgment debtor examination. Francis looked in Amormino's direction and motioned toward him, saying that he thought there were a couple of members of the media present. The court refused to exclude the press but informed them that no notes could be taken once the debtor examination began.

4

While in the courtroom, Francis addressed the court directly several times, despite being admonished to do so only through his counsel. According to Amormino, Francis "kind of blurted out Mr. Wynn had threatened to hit him in the back of the head with a shovel and bury him in a hole in the desert." This statement was not made in the context of requesting a restraining order from the commissioner. Before Francis made it, there had been no discussion among the lawyers and the commissioner about a restraining order.

The commissioner responded by telling Francis he had the option to seek a restraining order and a criminal complaint, which Francis "said he intended to do." The commissioner's statement was the first Amormino heard of any mention of a restraining order.

Francis's version of the hearing was quite different. He testified that he went to court to seek a restraining order.[2] He said Russell and Langberg finished talking with the commissioner, but he did not know the subject of their conversation. At the end of the proceeding, the court asked if there was anything else. According to Francis, he said he wanted to bring a motion, but preferred not to disclose the purpose in open court. He and Langberg asked the court to clear the courtroom. The court refused to do so. Francis said he tried to avoid stating the content of the threat, and did so only when pressed by the commissioner. He said that he told the commissioner that he learned of the threats from Quincy Jones, who, he said, had received communications from Wynn stating the death threat.

Amormino testified: "Once [Francis] walked outside the courtroom, I introduced myself and just let him know I was a member of the media. I went ahead and just let him know I'm turning this over to the news desk, if there's anything he wanted to retract. He

_____

[2] Whether or not Francis intended to seek a protective order, it is undisputed that he was appearing for a judgment debtor examination. "Under the enforcement of judgments law, a judgment debtor may be compelled to appear before the court or an appointed referee for examination regarding his or her assets. [Citation.]" (*Nebel v. Sulak* (1999) 73 Cal.App.4th 1363, 1368.)

said the same thing inside the courtroom." Amormino asked Francis if this really happened. Francis replied "'Absolutely.'" This statement is the basis for the second cause of action for defamation.

Amormino did not "really believe" the statement because of "the way [Francis] was acting and given his past." He approached Francis outside the courtroom partly to make sure he was serious. Amormino explained: "'[I]t's our practice to always, you know, if somebody said something in the courtroom, to always address it outside the courtroom to get further detail. [¶] I also said, 'Are you sure? I'm with TMZ. I'm going to be calling the news manager now. Is this an accurate statement? It's going to be everywhere.'" Francis responded: "'Absolutely.'" Amormino asked Francis, "'[A]re you going to pursue this?' because he [Francis] mentioned something about going to L.A. Parker Center. If so, that would be something we would want to be covering. So I kind of stuck with him for a little while." Francis also mentioned something about getting a restraining order. According to Amormino, if Francis had gone to the police, "it would have made it a little more serious in my mind." As far as he knew, Francis did not go to the police.

Francis testified that he made no statement to the reporters in the hallway, and that he just told them to get a copy of the transcript of the court proceeding.

Amormino reported statements made by Francis by telephone to the news manager for TMZ, Mike Walters. He read the statement verbatim from his notes. At trial he was asked: "And also you were satisfied that it was serious because he had confirmed that it was. He told you that it was accurate?" Amormino answered: "That's right." Had Francis told him that the death threat statement was not accurate and that he had made it up, Amormino would have reported that to TMZ as well, and it would have been included in its story. Amormino's report of Francis's statement and the ultimate story about it were based at least in part on Francis's confirmation of the statement made in the courthouse hallway. The actual republication by TMZ is not in the record on appeal, and is not the basis of Wynn's claims.

6

In June 2010, Wynn, as an individual, filed the present action for defamation against Francis in the Los Angeles Superior Court. Francis filed an amended answer asserting the section 47(b) privilege as an affirmative defense. The trial court granted Francis's motion to amend that defense to include the section 47(d) fair report privilege. The trial court denied Francis's motion for summary judgment on the privilege issue.

A jury trial was conducted. At the close of the evidence, Wynn brought a motion for partial directed verdict on the privilege issue. He also sought to amend the complaint to add a third cause of action for defamation based on Francis's repetition of the death threat statement during an appearance on Good Morning America close to trial. The court granted the directed verdict motion as to the first two causes of action. It found that section 47(b) did not apply because the statement made at the hearing was neither in furtherance of, nor designed to achieve the object of, the litigation that was going on then. As to the fair reporting privilege under section 47(d), the court concluded the evidence did not establish that Francis repeated his courtroom statement to the press outside in the hallway. Francis's testimony was that he did not speak to Amormino, and therefore the privilege did not apply at all. Alternatively, the court found, based on Amormino's testimony, that Francis did more than just repeat his statement. Instead, Amormino testified that Francis told him that the statement was accurate. This was in the context of questions from Amormino attempting to determine whether Francis was joking when he made the statement in the courtroom. After the trial court granted directed verdict as to the first two causes of action (the courtroom and hallway statements), it also granted leave to amend to add the third cause of action based on Francis's statements on Good Morning America.[3]

The jury returned a special verdict finding for Wynn on all three causes of action. It found that Francis made each of the statements counted on in the lawsuit, and that

---

[3] The record before us does not show that Francis was deemed to have asserted an answer to the third cause of action, raising the same affirmative defenses, including privilege, as those claimed in the amended answer to the other two causes of action.

Wynn proved by clear and convincing evidence that the statements were false. The jury awarded actual damages of $1 million on each cause of action; and assumed damages[4] of $3 million for the courtroom statement, $4 million for the hallway statement, and $10,000,000 for the statement on Good Morning America. Following a bifurcated trial, the jury awarded $20 million in punitive damages.

Francis moved for judgment notwithstanding the verdict, arguing the court should have granted judgment to him based on his privilege defenses. He also argued there was no evidence of damages on the third cause of action and that the award of punitive damages had to be set aside because Wynn failed to present competent evidence at trial of Francis's present financial wealth. Francis also moved for new trial, arguing the trial court erred in allowing Wynn to amend the complaint according to proof to add the third cause of action related to the statements made in the Good Morning America broadcast.

The trial court denied the motion for judgment notwithstanding the verdict on the privilege issue as to the first two causes of action. It concluded there was insufficient evidence to support any actual damages award on the third cause of action and granted judgment notwithstanding the verdict as to the $1 million actual damage award on that cause of action. It found sufficient evidence of assumed damages as to the same cause of action and denied the motion as to that argument. The court agreed that Wynn had failed to present competent evidence of Francis's financial condition and reversed the $20 million award of punitive damages on that basis. It also denied the new trial motion.

In October 2012, the court entered a permanent injunction against Francis, based on the jury's findings. It also took judicial notice that Francis repeated the false accusations in an interview he gave to a local television station during the course of the trial. It found it likely that Francis would continue to repeat the false accusations unless prevented from doing so by an injunction. Francis was permanently enjoined from

---

[4] Where a statement is slanderous per se, damage to the plaintiff's reputation is conclusively presumed and plaintiff need not introduce evidence of actual damages to support a damage award. (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 290 (*Hawran*); *Regalia v. Nethercutt Collection* (2009) 172 Cal.App.4th 361, 367.)

stating to anyone that Wynn threatened to kill him or to have him hit in the head with a shovel and buried in the desert. An exception was made for statements to governmental officials with relevant enforcement responsibilities. An amended judgment on special verdict was entered awarding Wynn $19 million plus interest against Francis.

Francis appealed from the judgment, the permanent injunction, and the partial denial of his motion for judgment notwithstanding the verdict.

## DISCUSSION

### I

The parties disagree about the issues which are properly before us, and the applicable standard of review.

*A. Issues Presented*

Francis cites the judgment on special verdict, the permanent injunction, and the order denying his motion for judgment notwithstanding the verdict in part in his statement of appealability in his opening brief. He argues that his statements made during the court proceedings were absolutely privileged under section 47(b), and therefore the court erred in granting a directed verdict on this defense. He also argues that his statements to TMZ and on Good Morning America were protected by the fair report privilege under section 47(d), and that the trial court erred in granting a directed verdict on this defense. Finally, he argues the trial court erred in allowing amendment according to proof to add the third cause of action for defamation based on the statements on Good Morning America.

Francis does not challenge the permanent injunction, the order denying portions of his motion for judgment notwithstanding the verdict, or the order denying his motion for new trial in his opening brief. Nor does he challenge the sufficiency of the evidence to support the special verdicts.

According to Wynn, the proper vehicle for appellate review of the privilege issue is not the ruling on directed verdict, but the order denying the motion for judgment notwithstanding the verdict on the privilege issues. We do not agree. The privilege issue

9

was not presented to the jury in light of the court's ruling on the directed verdict motion. Although Francis renewed his privilege arguments after trial, we conclude that they are most properly reviewed on the order granting the partial directed verdict.

Wynn asserts that the issues raised by the judgment, the permanent injunction and the order on judgment notwithstanding the verdict are waived because Francis failed to present argument on these issues in his brief. He then submits argument on the proper standard of review of those orders, suggesting that we may not review the directed verdict ruling without an appeal for the judgment notwithstanding the verdict order which also addressed the privilege issue.

We note that Francis specifically appealed from the order of November 9, 2012, the date of the court's minute order on the motion for judgment notwithstanding the verdict. In any event, the ruling on directed verdict is reviewable on appeal from the judgment as an intermediate order that substantially affects the right of a party. (*Lopez v. Brown* (2013) 217 Cal.App.4th 1114, 1134.)

In his reply brief, Francis contends that his arguments challenging the directed verdicts on privilege and the order granting leave to amend to conform to proof compel reversal and require dissolving the permanent injunction as well. Since the permanent injunction was based in large part on the special verdict, we agree that our resolution of the other issues on appeal will necessarily impact the viability of the permanent injunction. For this reason, we decline to treat that issue as forfeited or abandoned. (See *Supervalu, Inc. v. Wexford Underwriting Managers, Inc.* (2009) 175 Cal.App.4th 64, 84, fn. 5.)

B. *Standards of Review Applicable to Directed Verdict*

On appeal from a directed verdict, "'we decide de novo whether sufficient evidence was presented to withstand a directed verdict. [Citation.]" (*Bonfigli v. Stachan* (2011) 192 Cal.App.4th 1302, 1315.) We review the evidence in the light most favorable to Francis, resolving all conflicts and drawing inferences in his favor. (*Conn v. Western Placer Unified School Dist.* (2010) 186 Cal.App.4th 1163, 1174.) If there is substantial

evidence to support his claim, and the law supports it, we must reverse the directed verdict. (*Ibid.*)

Wynn relies on *Williams v. City of Belvedere* (1999) 72 Cal.App.4th 84 (*Williams*), which is distinguishable. In that case, the appellate court stated that the trial court had been asked to act as the trier of fact on the affirmative defense of timeliness of the administrative claim, rather than simply determining whether the plaintiff's case was strong enough to support a jury verdict as in a normal directed verdict motion. (*Id*. at p. 89.) Under those circumstances, the court of appeal concluded the substantial evidence standard was appropriate. (*Id*. at pp. 89–90.) Here, Francis objected to the directed verdict on the ground that the privilege issue was for the jury to decide. The trial court did not act as trier of fact on the privilege issue.

II

Francis argues the death threat statement made in the courtroom before the commissioner is privileged under the litigation privilege, section 47(b). The court found that it did not apply.

The privilege under section 47(b) "'applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of litigation; and (4) that have some connection or logical relation to the action.' (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212.)" (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 912 (*Kashian*).) This privilege is absolute, and applies "regardless whether the communication was made with malice or the intent to harm." (*Id*. at p. 913.) "If there is no dispute as to the operative facts, the applicability of the litigation privilege [section 47(b)] is a question of law. (*Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1139–1140.) Any doubt about whether the privilege applies is resolved in favor of applying it. [Citation.]" (*Ibid.*)

Francis contends that it is undisputed that he made the statements to a judicial officer (the commissioner) during the course of a judicial proceeding (the judgment debtor proceeding). He also argues the trial court erred in concluding that he failed to

11

present evidence that the statement was made to achieve the objects of the litigation, and had some connection or logical relation to the action. Francis contends that it is undisputed that he made the statement and that a discussion of restraining orders and the relevant procedures ensued.

Francis asserts "Since the debtor examination proceedings involved the attempts by Wynn Las Vegas to collect on an approximately $2 million judgment against FRANCIS, threats made by the Chairman of the judgment creditor Wynn Las Vegas against the life of FRANCIS certainly had some 'logical relation' to the debt collection judicial proceedings." He asserts the threats were related to his failure to pay the judgment, and that the debtor's examination was to assist in the collection of that judgment. Francis contends he was seeking to inform the court of threats and to be afforded the protection of the court. He cites the discussion in the courtroom about protective orders. We agree that Francis should not be expected to understand and apply the difference between a protective order and a restraining order, and the power of the commissioner to order one or the other.

Although the privilege is broadly applied and doubts are resolved in its favor, *Hawran*, *supra*, 209 Cal.App.4th at pages 282–283, the directed verdict was properly granted in this case. In *Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, the court held that under section 47(b), the "'connection or logical relation' which a communication must bear to litigation in order for the privilege to apply, is a *functional* connection." (*Rothman*, 49 Cal.App.4th at p. 1146.) The court explained that the communication "must function as a necessary or useful step in the litigation process and must serve its purposes" (*ibid.*) and "cannot be satisfied by communications which only serve interests that happen to parallel or complement a party's interests in the litigation," including vindication in the court of public opinion. (*Id.* at p. 1147.) The test "can be satisfied only by communications which function intrinsically, and apart from any consideration of the speaker's intent, to advance a litigant's case." (*Id.* at p. 1148; see also *Hawran*, at p. 283, which relies on *Rothman*.)

The evidence presented at trial does not establish that the death threat statement advanced Francis's effort to exclude the press and other attorneys from the debtor examination, or his position in the debtor examination itself. Even if we credit Francis's testimony that he went to court for the purpose of obtaining a protective order, he has not established how the death threat statement was designed to achieve the objects of the litigation or had any connection or logical relation to it. Francis cannot cloak himself with the privilege by blurting out a defamatory statement at an unrelated court proceeding. He was in court to undergo examination as a judgment debtor as to the Nevada judgment. We conclude the evidence did not satisfy the requirements for privilege under section 47(b) and that the directed verdict was properly granted on that ground.

### III

Francis claimed the privilege of section 47(d) as to Wynn's claims based on his statement to Amarmino in the courthouse hallway, and for the statement he made on Good Morning America.

"Civil Code section 47 makes privileged 'a fair and true report in, or a communication to, a public journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof, or (E) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant has been issued.' (Civ. Code, § 47, subd. (d).) [The party invoking the privilege] bears the burden of proving the privilege applies. (*Carver v. Bonds* [(2005) 135 Cal.App.4th [328] 348–349; *Mann*[*v. Quality Old Time Service, Inc.* (2004)] 120 Cal.App.4th [90] 109.)" (*Burrill v. Nair* (2013) 217 Cal.App.4th 357, 396 (*Burrill*).)

"'The privilege applies if the substance of the publication or broadcast captures the gist or sting of the statements made in the official proceedings.' [Citations.] If Civil Code section 47, subdivision (d) applies, the statement is absolutely privileged regardless of the defendant's motive for reporting it. [Citation.]" (*Hawran*, *supra*, 209 Cal.App.4th

at p. 278.)  The fair report privilege has been construed broadly.  (*Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 240.)

A.  *Hallway Statement*

Francis testified that "the press" spoke with him in the hallway after the court proceeding.  But he said that he did not elaborate on his courtroom statement.  He said he told the press only that:  "'I'm not allowed to talk about anything out here.  What you heard in that courtroom was it.  Get a copy of the transcript.'  The press asked me in the hallway, tried to corner me, and get me to say something else."  Francis's testimony was directly contradicted by Amormino's description of the hallway conversation.  Amormino testified that he asked Francis if this really happened, and that Francis replied, "'Absolutely.'"

Thus there was a factual dispute as to what Francis said to the press in the hallway.  He denies making any substantive statement at all.  It is apparent that the jury credited Amormino's testimony because it returned a special verdict in favor of Wynn on the second cause of action based on the republication of the death threat statement in the courthouse hallway.  Francis has not carried his burden of proving the statement was no more than a fair report of what was said in the courtroom, a requirement for application of the fair report privilege.  (*Burrill*, *supra*, 217 Cal.App.4th at p. 396.)

Alternatively, Wynn argues that the hallway conversation changed the gist of the statement from a joke to a serious accusation about the death threat.

We conclude the evidence establishes that Francis went beyond reporting what he said in the courtroom to Amormino.  Amormino testified that he did not "really believe" the death threat statement because of "the way [Francis] was acting and given his past."  He approached Francis outside the courtroom partly to make sure he was serious.  Amormino asked Francis, "'Are you sure?  I'm with TMZ.  I'm going to be calling the news manager now.  Is this an accurate statement?  It's going to be everywhere.'"  Francis responded:  "'Absolutely.'"  Francis's response convinced Amormino that he was serious about the death threat, and was not joking about it.  His report of Francis's

14

statement and the ultimate story about it were based at least in part on Francis's confirmation of the statement made in the courthouse hallway.

Amormino's testimony established that two things occurred in the hallway. First, Francis confirmed that he made the statement in the courtroom and was serious about it. It also established that Francis made a new statement that repeated the death threat. Amormino testified that he asked Francis whether "it" really happened. Francis replied "Absolutely." The only fair reading of this testimony is that the antecedent of "it" was the threat. This was a separate statement, to which the privilege of section 47(d) did not apply.

B. *Good Morning America Statement*

Francis also argues the fair report privilege applies to the cause of action based on the Good Morning America broadcast. We conclude the issue is forfeited because it was not presented in the trial court. The trial court granted a directed verdict on the second cause of action under the fair report privilege based on the statement Francis made in the courtroom hallway, before the complaint was amended to add the cause of action arising from the Good Morning America statement. At the hearing, counsel for Francis did not ask the court to deem its amended answer, including this affirmative defense, to apply to the third cause of action. In his motion for judgment notwithstanding the verdict, Francis argued that the fair report privilege applied to the second cause of action, based on his statements to Amormino in the courthouse hallway; he did not assert that privilege as to his statements on Good Morning America. Failure to raise a defense in the trial court results in forfeiture of the claim on appeal. (*In re Marriage of Zimmerman* (2010) 183 Cal.App.4th 900, 912.)

Even if we did consider the defense, we would conclude that Francis presented no evidence of the content of the Good Morning America statement, and thus failed to carry his burden of proving that the fair report privilege applied. The trial court excluded a video of the broadcast based on Francis's objection to its admission. Although two witnesses testified about the broadcast statement, Francis cites only the testimony of Mitchell Langberg, counsel for Wynn. Langberg testified that Francis repeated the death

15

threat statement in deposition testimony taken in this case. He was then asked whether he had heard Francis repeat the accusation after the deposition. He replied: "Only what I have seen in the media last week on TV. He said—he made the same statement."

A second witness also testified about the broadcast. Michael Rumbolz testified as an expert witness on gambling for Wynn. He was asked whether he was aware of the allegedly defamatory death threat statement made by Francis. Rumbolz said: "If you're referring to the Good Morning America – I saw Good Morning America this morning. And he—there was a videotape of the defendant saying Steve Wynn threatened to kill him; hit him with a shovel in the head."

The evidence is that Francis made the death threat statement on Good Morning America. There is no evidence that Francis limited his comment in that broadcast to whether he had made a particular statement in the Los Angeles courtroom proceeding. It was Francis's burden to establish that his statement came within the fair report privilege. He did not satisfy this burden. On this record, the privilege did not apply.

The video tape of the broadcast might have filled this evidentiary gap, but it was excluded at Francis's request. We may not view the excluded evidence, submitted by Wynn in his appendix and argued in his brief, to establish the context of the Good Morning America statement. (See *Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.* (2013) 217 Cal.App.4th 1096, 1105 [in absence of challenge to trial court ruling excluding evidence, "the excluded evidence, though part of the 'record on appeal' (Cal. Rules of Court, rule 8.832) may not be used by this court to reverse the order of the trial court"].) We next address Francis's claims that he was precluded from presenting evidence of the content of the Good Morning America statement by the late amendment of the complaint.

IV

Francis argues the trial court erred by allowing amendment of the complaint to allege a third cause of action based on his statement made on Good Morning America. He argues that allowing the amendment after the parties rested denied him the

16

opportunity to introduce evidence as to whether he did or did not make any statement on Good Morning America, or that the statement did not constitute slander per se, and therefore assumed damages as to that claim were not appropriate. He also complains that he was unable to present evidence regarding the appropriate measure of assumed damages on this cause of action. Francis makes much of the possible conflict between Langberg and Rumholz's accounts of when the Good Morning America interview was broadcast. It is undisputed that the broadcast occurred either shortly before trial or during trial. Francis did not take the opportunity to explore this issue in cross-examination of the witnesses.

Wynn contends that Francis was put on notice about the Good Morning America claim in opening statement by Wynn's counsel. He also notes that the complaint alleged that Francis published the death threat statement "on at least two occasions." The trial court found that Francis's argument that he was prejudiced by the delay in amending the complaint had no merit. It observed that the amendment was based on the same facts, the death threat statement, and stated: "It is difficult to see how defendant could have been prejudiced by the addition of the cause of action alleging exactly the same facts that the parties had spent two years vigorously litigating." The court also noted that Francis failed to identify any evidence he would have introduced to rebut the evidence of the Good Morning America statement, and had not sought permission to reopen his case in chief in order to introduce new evidence, "a request the court certainly would have granted."

The trial court also found Francis's argument that he was surprised by the amendment "not credible." It found: "After two years of litigation over the very same statements, defendant elected to publish them again to the national media while the trial was ongoing. Plaintiff's motion to add a third cause of action based on the third publication could not feasibly have come as a surprise to defendant notwithstanding his protests to the contrary."

The trial court has discretion to allow amendments to conform to the proof and its determination will not be disturbed on appeal unless abuse of discretion is demonstrated.

17

(*Duchrow v. Forrest* (2013) 215 Cal.App.4th 1359, 1378.) The trial court should consider "'"(1) whether the facts or legal theories are being changed and (2) whether the opposing party will be prejudiced by the amendment."' [Citations.]" (*Ibid.*) "'"The amended pleading must be based upon the same general set of facts as those upon which the cause of action or defense as originally pleaded was grounded."' [Citations.]" The court also considers the reason for the delay until trial in seeking the amendment. (*Ibid.*)

We find no abuse of discretion. The legal theory regarding the third cause of action is the same as presented on the second cause of action. As the trial court found, it is based on a new publication of the same defamatory death threat statement, according to the testimony of Langberg and Rumholz. The reason for the delay is that the statement was not made until shortly before the time of trial. Since Francis was on notice that Wynn was seeking damages in defamation for publication of this statement on "at least two occasions," he should have been aware that republishing the statement during the trial would subject him to an amendment of the complaint to bring all claims related to that statement into a single proceeding. Under the circumstances noted by the trial court in its ruling denying new trial on this issue, we find no abuse of discretion in allowing the amendment.

## DISPOSITION

The amended judgment, permanent injunction, and order denying the motion for judgment notwithstanding the verdict are affirmed. Wynn is to have his costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EPSTEIN, P. J.

We concur:


WILLHITE, J.                          MANELLA, J.

18