Filed 1/21/15  Garcia v. Cal. Dept. of Corrections etc. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JOSEPH GARCIA, | D063346 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. ECU05984) |
| CALIFORNIA DEPARTMENT OF CORRECTIONS & REHABILITATION, | ORDER MODIFYING OPINION |
| Defendant and Respondent. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed on January 16, 2015, be modified as follows:

On page 1 of the opinion, the superior court case No. ECU05684 is deleted and in its place, the correct case number is inserted so that the caption now reads:  (Super. Ct. No. ECU05984).

O'ROURKE, Acting P. J.

Filed 1/16/15 (unmodified version)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JOSEPH GARCIA,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CALIFORNIA DEPARTMENT OF CORRECTIONS & REHABILITATION,<br><br>    Defendant and Respondent. | D063346<br><br><br>(Super. Ct. No. ECU05684) |

APPEAL from a judgment of the Superior Court of Imperial County, Jeffrey Bruce Jones, Judge.  Affirmed.

Law Offices of David A. Miller and David A. Miller for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Alicia M. B. Fowler, Assistant Attorney General, Chris A. Knudsen and Michael J. Early, Deputy Attorneys General, for Defendant and Respondent.

Following a hearing in a bifurcated proceeding, a jury reached a verdict that climbing ladders and scaffolds was an essential function of Joseph Garcia's job as a Painter II at the California State Prison in Centinela (Centinela) located in Imperial County, California. The trial court subsequently granted a directed verdict as to Garcia's claim for wrongful

termination in violation of public policy and various causes of action under the California Fair Employment and Housing Act ((FEHA); Gov. Code,[1] § 12900 et. seq.): failure to accommodate disability, disability discrimination, failure to prevent discrimination, failure to take action, and failure to thoroughly investigate. Respondent California Department of Corrections and Rehabilitation (CDCR) successfully moved for summary adjudication of the remaining retaliation cause of action.

Garcia contends CDCR: (1) discriminated against him based on disability; (2) failed to accommodate his disability; and (3) failed to engage in the interactive process. He further contends the trial court failed to properly allow evidence, did not properly instruct the jury, used a defective special verdict form, and erroneously granted summary adjudication of his retaliation cause of action. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In 1993, CDCR hired Joseph Garcia as a Painter II at Centinela.

In 1998, Garcia's medical doctor wrote a letter to CDCR stating Garcia was experiencing headaches, vertigo and neck pain, which were symptoms of an injury he had suffered while working as a painter for CalTrans in 1993. The doctor requested restricted work for Garcia, stating: "[Garcia] is physically capable of performing his usual and customary work, as long as it is at ground level. He should be restricted from climbing on ladders, roofs, scaffolding, or extension ladders. He should be precluded from the use of any aerial devices." Therefore, in 1998, CDCR permitted Garcia to work as a painter with

---

[1] Statutory references are to the Government Code unless otherwise stated.

restrictions, including that he not climb roofs, ladders, scaffolding, tension ladders or unattended areas.

In mid-2007, CDCR requested that Garcia obtain an updated medical clearance from his doctor. Garcia did not do so, and in November 2007, Dr. Thomas Bruff conducted a fitness-for-duty evaluation of Garcia and concluded he was unable to perform the essential functions of his job: "[Garcia] must be able to work at heights and in stressful situations as clearly noted in the job description. However, as clearly noted in the medical record provided and in this examiner's opinion, Mr. Garcia is unable to perform these functions. What is required is a modified or alternative work at the discretion of human resource personnel. Modifications would include no safety sensitive work, no work at height, no work on ladders, scaffolds, or on roofs."

On December 10, 2007, Stephenie Tapia, a return-to-work coordinator at Centinela, met with Garcia and explained his employment options in light of Dr. Bruff's evaluation. Tapia also wrote Garcia a letter outlining a range of options, including: (1) return to work full duty if Garcia provided a full medical release in writing; (2) submission of a request for reasonable accommodation to perform his current position or another position and CDCR would provide him a list of vacancies for other positions; (3) medical transfer/demotion; (4) transfer to alternative position based on merit or fitness; (5) temporary disability leave; (6) medical leave of absence; (7) temporary assignment to an agency for up to two years; (8) separation from state service; (9) service retirement; and (10) voluntary resignation. Garcia responded by checking a form option stating that he sought to return to work with or without reasonable accommodation.

3

On December 31, 2007, Tapia sent Garcia another letter stating, "I would like to invite you to further engage in the interactive process and develop a plan to pursue which options are available to you. . . . I have not received your completed application."

In September 2009, CDCR notified Garcia that effective November 30, 2009, it would medically demote him from his painter position—whose essential functions he could not perform—to that of laboratory assistant at California State Prison, Solano (Solano) located in Vacaville, California. CDCR's letter stated, "Modifying your Painter II job as noted by Dr. Bruff would require the waiver of the essential functions of the Painter II classification. The CDCR cannot accommodate the waiver of essential functions." In January 2010, after Garcia failed to timely report to the new position at Solano, CDCR regarded him as absent without leave, and his employment at CDCR ended.

In November 2011, Garcia filed an operative first amended complaint alleging nine causes of action: (1) wrongful termination in violation of public policy; (2) failure to engage in the interactive process; (3) failure to accommodate disability (§ 12940, subd. (m)); (4) disability discrimination (§ 12940, subd. (a)); (5) failure to prevent discrimination (§ 12940, subd. (j)); (6) failure to take action (§ 12940, subd. (j)); (7) failure to thoroughly investigate (§ 12940); (8) retaliation (§ 12940); and (9) unpaid wages (Lab. Code, §§ 201, 203).

Before trial, CDCR moved in limine for judgment on the pleadings or alternatively to dismiss the disability discrimination claim, arguing Garcia was not a qualified injured worker within the definition of FEHA. In response, the court issued an order to show cause why the trial should not be bifurcated and the jury separately determine the essential

functions of the Painter II position.  (Code Civ. Proc. § 1048, subd. (b).)  At a hearing on the matter, Garcia's counsel sought clarification regarding how much time the bifurcated trial would last.  The court responded that if the jury found Garcia was not a qualified person under the FEHA, that would end the inquiry.  Garcia's counsel replied, "I just want to make sure that we're going to have a full opportunity to put on every witness on this issue, and then I guess you want the jury to make a separate finding.  Once that happens, then we'll go on [to] damages?"  The court replied, "Correct."  Garcia's counsel acquiesced, stating, "That would seem appropriate to me."  Following further discussion, the court ruled, "So I think it would be a better choice to have the jurors determine separately what are the requirements of this position, what do you have to be able to do, and then we'll go from there."  Garcia's counsel responded, "That sounds pretty good."

*Garcia's Trial Evidence*

Garcia testified he did not graduate from high school.  He also testified about his injuries, his Painter II job duties, and accommodations he received from CDCR exempting him from climbing ladders.

Roseta Ochoa, a former Centinela prison warden, testified on direct examination that the use of ladders and scaffolding was not an essential part of Garcia's job.  However, on cross-examination she admitted that if Garcia couldn't paint certain high areas in parts of the prison inaccessible to inmates, another professional painter would be needed to do that job.

Larry Jones, Garcia's work supervisor, testified Garcia's work was "very good."  On cross-examination, Jones testified it was an essential function of the Painter II classification to be able to work at heights.

5

Rito Contreras, a Centinela Painter III, testified that an essential function of the Painter II job was to work at heights.

*CDCR's Trial Evidence*

Orrin Alford previously supervised Garcia's work and testified that painters at Centinela were sometimes required to do above-ground work like washing, scraping and masking in preparation for painting, and afterwards painting bars by hand in places like the observation booth. Alford testified that sometimes inmates could not do some above-ground work because the prison was on lockdown or certain areas were inaccessible to inmates.

Juan Nessi, a previous Centinela plant manager in charge of maintaining, repairing and operating the facility plant, testified that when Alford was a Painter III, he had expressed concerns regarding Garcia's inability to climb ladders to paint. In response, Nessi noted: "[A] painter and a ladder go hand in hand. It's part of the position of Painter II, that you need to have to be—to reach heights that—required to finish the job. You know, like painting the ceiling or painting the wall and ceiling, you have to cut with a brush." Nessi explained that "cutting" referred to giving a small sharp finish in corners between the ceiling and the wall. He also testified that a Painter II was required to work on ladders, scaffolding and aerial lifts because some buildings were tall.

Tapia testified regarding a Painter II's job description. Centinela warden Domingo Uribe, Jr., testified that one of the essential duties of the Painter II job is to work above ground. The court admitted into evidence documents including a CDCR Painter II job description listing among the essential duties and responsibilities of the job that the painter "[m]ay be

required to use an aerial lift device, work on scaffolding, extension ladders and second story roofs." That same document notes that some paint jobs involve work in precarious places like roofs, which can be 10 to 30 feet high, and that the Painter II might need to utilize scaffolding. The job description also states: "One or more inmate workers may be utilized in the performance of these duties; however, the employee must be able to meet the physical demands as described because inmate workers are not always available. Due to security requirements, inmates are not permitted to work on the building rooftops, in any of the equipment rooms located within the maximum-security compound or in the housing control units. Also, inmate workers are not available during periods of lockdown or times of institutional emergencies."

Other documents admitted into evidence included a Centinela "duty statement" outlining a Painter II's duties and a statement from Jones, explaining to a Centinela return-to-work coordinator, Felecia Barker, how Garcia performed his painting jobs without using a ladder or being on a scaffold, and how he was able to paint ceilings or roofs.

The court modified CACI No. 2543 and instructed the jury generally regarding essential job duties.[2] The jury's special verdict form asked: "Is working on ladders or scaffolds at

---

[2]    The court instructed the jury that: "Joseph Garcia contends that the essential job duties of the position of Painter II did not include working above 4 feet off the ground on ladders or scaffolds. To succeed, Joseph Garcia must prove by a preponderance of the evidence that working above 4 feet off the ground on ladders and scaffolds was not an essential job duty of the position of Painter II. [¶] In deciding if a job is essential, you may consider, among other factors, the following: [¶] a. Whether the reason the job exists is to perform that duty; [¶] b. The number of employees available who can perform that duty; and [¶] c. Whether the job duty is highly specialized."

7

heights above four feet an essential job duty of the position of Painter II?" The jury responded, "Yes."

In light of the jury's finding, CDCR moved for nonsuit on all causes of action. The court asked Garcia for an offer of proof regarding what kind of accommodations Garcia needed to make him a qualified individual. Garcia's counsel replied, "Well, the evidence is that [Garcia] had inmate crews and he had coworkers who painted with him that could perform that part of the work for him to accomplish the task of the job, which was to put paint on the walls. [¶] So when Mr. Garcia can be accommodated in such a manner, either with tools or by restructuring or modifying his job in that manner, and they did it for 16 years, that that's proof in itself that the accommodation they granted him was effective, allowed him to effectively complete all of his work assignments and perform every aspect." The court responded that in light of the jury's finding, Garcia was not a qualified individual under FEHA. The court tentatively granted the nonsuit motion, but requested further briefing.

Garcia submitted with briefing stating he had already made his arguments orally at the hearing, and would submit on the court's tentative ruling to grant the nonsuit motion. Following a hearing, the court granted nonsuit, but later modified the judgment to grant a directed verdict as to all remaining causes of action except the eighth, retaliation, as to

---

The court also instructed: "Evidence of whether a particular function is essential includes, but is not limited to, the following: [¶] The employer's judgment as to which functions are essential. [¶] 2. Written job descriptions prepared before advertising or interviewing applicants for the job. [¶] 3. The amount of time spent on the job performing the function. [¶] 4. The consequences of not requiring the plaintiff to perform the function."

8

which it declared a mistrial. The court noted that the ninth cause of action for unpaid wages had been disposed of in the in limine motion for judgment on the pleadings. CDCR moved for summary judgment on the retaliation cause of action, arguing Garcia could not establish a prima facie case of retaliation: "First, he cannot show that he engaged in a protected activity, as he filed no complaint or participated in any proceeding under FEHA. Instead, he made a request that he be excused from performing an essential function of his job. This is not protected activity. Second, [Garcia] cannot show a causal link between his request to be excused from climbing ladders, etc. in 2007, and his medical transfer in December 2009." Furthermore, CDCR claimed it had a legitimate nonretaliatory reason for medically demoting Garcia in 2009; namely, Dr. Bruff's examination confirmed Garcia suffered from vertigo, which prevented him from performing the essential functions of his Painter II job. CDCR argued that in assigning Garcia to Solano prison as a lab assistant, it had elected "the highest paying and closest position available." Finally, CDCR argued it did not have retaliatory intent in terminating Garcia.

CDCR supported its summary judgment motion with a declaration from Tapia stating that Dr. Bruff had determined Garcia could not perform the essential functions of his job because of his inability to work at height due to "a balance problem that poses an immediate and real expectation of [harm] occurring to himself and coworkers if [Garcia] was placed at height." Tapia elaborated: "The essential functions of a Painter II position include the ability to mix paints and match colors, scaffolding and rigging, do paper hanging, estimate material needed, keep simple records and make reports, follow oral and

9

written instructions, read and write English [at] a level appropriate for the classification and erect and paint from ladders." Tapia concluded CDCR was unable to find a suitable replacement job for Garcia: "Between January 2008 and June 2009 I worked with other CDCR personnel to locate a position for [Garcia] given his inability to perform the essential functions of his Painter II position. However, [Garcia] insisted on a single accommodation—that the status quo be maintained and that he be allowed to work in a permanent light duty assignment. Another factor which complicated my efforts to locate [him] a position he could physically perform was the fact that [he] did not meet the minimum education requirements of most positions because he does not have a high school diploma or a GED. On July 15, 2009, CDCR informed [Garcia] that since he refused a voluntary demotion and could not perform the essential functions of the Painter II position, he would be medically demoted."

Attached to Tapia's declaration were a copy of Dr. Bruff's report of his medical evaluation of Garcia, Centinela's job description for the Painter II position and correspondence between Tapia and Garcia regarding the interactive process to accommodate Garcia's illness.

Warden Uribe also submitted a declaration in support of CDCR's motion for summary judgment: "I met with [Garcia] several occasions in 2009 to discuss his options because [he] could not perform the essential functions of the Painter II position because he could not work at heights. During these meetings I explained that the CDCR would not permanently waive the essential functions of his job and that if he could not climb ladders or otherwise work at heights, he could not be a Painter II. Moreover, given the danger his

10

condition presented to his safety and the safety of [his] co-workers, no accommodation was possible to allow [him] to perform the essential functions of the Painter II position." In opposing summary judgment, Garcia argued his complaint raised "a viable claim of retaliation which is well supported by controverting evidence [*sic*]—thus raising triable issues of material fact on the retaliation claim." He further argued that he had insisted that CDCR continue "the permanent reasonable accommodation status granted by the [w]arden and permitted for 16 years." Garcia claimed his termination was motivated by his assertion of a legal right to reasonable accommodation in light of his disability. He argued the restriction that he not use a ladder or scaffold "was not really an 'essential' job function and compromised only 1.4 [percent] of his total job duties"; therefore CDCR could still reasonably accommodate him.

The court granted the summary judgment motion, finding no triable issue of material fact existed and Garcia could not establish a prima facie case of retaliation because he did not engage in a protected activity under FEHA. It ruled: "[Garcia's] request to be excused from the essential function of climbing ladders or working more than four feet above the ground, predated the medical demotion by many years and there was no evidence of a nexus between [Garcia's] request to be excused from the essential function of climbing ladders and the medical demotion which occurred in 2009, following the 2007 Fitness for Duty exam." The court continued: "[Garcia] failed to produce any evidence of a retaliatory animus by any decision maker involved with [his] medical demotion in 2009. Similarly [Garcia] produced no evidence that there were other positions to which he could have been transferred, which were closer in proximity to El Centro, California."

11

Garcia moved for judgment notwithstanding the verdict, new trial, and to vacate and enter a different judgment, arguing: "The court improperly, on its own sua sponte motion, bifurcated the trial, restricting [Garcia's] evidence to only part of one legal phase. The court abused its discretion by writing its jury instruction while at the same time telling [Garcia] there would be opportunity for further trial testimony and evidence—which was fact not true [*sic*]. The court improperly aided the defense by suggesting the defense make motions for nonsuit when in fact the plaintiff had not fully presented its evidence, then the court granted the nonsuit motion and repeatedly changed the motion title. [Garcia] was materially and prejudicially affected and never allowed a fair trial. [¶] [Garcia's] limited evidence established that the ladder 'requirement' was only 1.4 [percent] of the total job and that for 16 years [Garcia] successfully performed his job assignments without any impact on the other painters. Therefore the ladder 'requirement' was inconsequential to performance as a Painter II and the verdict claiming it was 'essential' fails as a matter of law and fact. [¶] [Garcia] should have been allowed to present all evidence to show [he] could perform his job with reasonable accommodation, which accommodation [he] demonstrated was permanently granted to him in accordance with California law."

The court denied Garcia's motion, concluding the jury's verdict was "clearly supported by the evidence." The court told Garcia's counsel: "[Y]ou have focused on the 16-year period that Mr. Garcia did the job with the waiver, the accommodation, and you have focused on that as evidence that the essential functions of the job do not require climbing the ladders or scaffolding. I see that differently." The court elaborated: "Although it is not pled and there was no attempt to prove it, it might give rise to an estoppel, but that is not here. That

12

was not pled. There was no mention of estoppel. In fact, my saying that right now is probably [the] first time it has been mentioned in the case."

DISCUSSION

I.

To the extent Garcia contends the court erred by bifurcating the trial, we reject the contention.

As noted, the trial court issued an order to show cause why it should not proceed with bifurcation under Code of Civil Procedure section 1048, subdivision (b), which states: "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any cause of action . . . or of any separate issue or of any number of causes of action or issues, preserving the right of trial by jury required by the Constitution or a statute of this state or of the United States." In general, "[w]hether there shall be a severance and separate trials on issues in a single action is a matter within the discretion of the trial court." (*Shade Foods* (2000) 78 Cal.App.4th 847, 911 quoting *Downey Savings & Loan Assn. v. Ohio Casualty Ins. Co.* (1987) 189 Cal.App.3d 1072, 1086.)

Garcia's counsel agreed with the court's decision to bifurcate the proceedings, and obtained the court's assurance that the jury would assess damages in a second phase of trial. The fact that the jury's verdict and the motions for directed verdict and summary judgment subsequently disposed of Garcia's causes of action—thus rendering a second phase of trial unnecessary—did not make the court's initial decision to bifurcate the issues arbitrary or

13

capricious.  To the contrary, the outcome of the jury trial vindicated the court's decision to sever the proceedings in the interest of judicial economy.

## II.

Garcia contends that by terminating him, CDCR discriminated against him based on his disability:  "CDCR has never set forth a credible reason to revoke a permanent accommodation granted to Garcia for 16 years."  Garcia adds, "An employee is not discarded simply because they sustained an injury which causes a relatively minor disability."

This contention, as well as the contentions addressed in sections III, IV, and V, are governed by the standard of review relating to directed verdicts:  "A directed verdict may be granted only when, disregarding conflicting evidence, giving the evidence of the party against whom the motion is directed all the value to which it is legally entitled, and indulging every legitimate inference from such evidence in favor of that party, the court nonetheless determines there is no evidence of sufficient substantiality to support the claim or defense of the party opposing the motion, or a verdict in favor of that party."  (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 629-630.)  On appeal from a directed verdict, we decide de novo whether sufficient evidence was presented to withstand a directed verdict.  (*Bonfigli v. Strachan* (2011) 192 Cal.App.4th 1302, 1315.)

To establish a prima facie case of physical disability discrimination under FEHA, the employee must demonstrate that he or she is disabled, is otherwise qualified to do the job, and was subjected to an adverse employment action because of such disability.  (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 432, fn. 2; *Faust v. California*

14

*Portland Cement Co.* (2007) 150 Cal.App.4th 864, 886.) Being a "qualified individual," means an employee who can perform the essential functions of the job with or without reasonable accommodation. (*Green v. State of California* (2007) 42 Cal.4th 254, 260-261.) If the employee meets this burden, it is then incumbent on the employer to show that it had a legitimate, nondiscriminatory reason for its employment decision. (*Deschene v. Pinole Point Steel Co.* (1999) 76 Cal.App.4th 33, 44.) When this showing is made, the burden shifts back to the employee to produce substantial evidence that the employer's given reason was either "untrue or pretextual," or that the employer acted with discriminatory animus, in order to raise an inference of discrimination. (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1004-1005.)

As noted, following the jury's finding that an essential aspect of Garcia's job involved climbing ladders and scaffolds, the court provided Garcia an opportunity to brief the issue of how he could perform the essential functions of his job with accommodation. However, Garcia did not provide a responsive brief; rather, he elected not to further challenge the court's tentative motion to grant nonsuit on his causes of action.

We conclude the court did not err in ruling that substantial evidence supported the jury's verdict. Specifically, CDCR established via testimony from Centinela personnel who supervised Garcia and that of the return-to-work coordinator, as well as Centinela documents describing the Painter II position that an essential function of the Painter II position was to paint above ground. Consequently, Garcia was required to show he could perform that job with or without accommodation, but he failed to do so. He therefore did not meet his initial burden of establishing a prima facie case of discrimination. Under the

15

burden-shifting test set forth above, the burden never shifted to CDCR to produce admissible evidence that the adverse employment action was taken for a legitimate nondiscriminatory reason.

We recognize Garcia presented evidence of his long employment at CDCR, the longtime accommodation CDCR provided him, and his supervisors' favorable evaluation of his work. But the precise inquiry under FEHA pertained to the essential functions of his job, and the jury answered that question adversely to him based on substantial evidence. On appeal, Garcia has provided us no basis for setting aside the jury's verdict. Garcia also failed to point to evidence showing he could do the essential functions of the Painter II job with or without accommodation.

III.

Garcia contends CDCR failed to accommodate his disability and it "focuse[d] improperly on [his] not qualifying for or being able to perform an essential job function. CDCR conveniently overlook[ed] the operative term 'reasonable accommodation.' "

The essential elements of a claim of failure to accommodate under section 12940, subdivision (m) are: (1) the plaintiff has a disability covered by FEHA; (2) the plaintiff is a qualified individual; and (3) the employer failed to reasonably accommodate the plaintiff's disability. (*Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 255-256 (*Jensen*).) "The elements of a failure to accommodate claim are similar to the elements of a . . .

16

section 12940, subdivision (a) discrimination claim, but there are important differences. The plaintiff must, in both cases, establish that he or she suffers from a disability covered by FEHA and that he or she is a qualified individual. For purposes of [a failure to accommodate] claim, the plaintiff proves he or she is a qualified individual by establishing that he or she can perform the essential functions of the position to which reassignment is sought, rather than the essential functions of the existing position. [Citations.] More significantly, the third element [under a section 12940, subdivision (a) claim] . . . establishing that an 'adverse employment action' was caused by the employee's disability— is irrelevant to this type of claim. Under the express provisions of the FEHA, the employer's failure to reasonably accommodate a disabled individual is a violation of the statute in and of itself." (*Jensen*, at p. 256.)

FEHA does not obligate an employer to choose the best accommodation or the specific accommodation sought by a disabled employee or applicant. (*Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 228.) It requires only that the accommodation chosen be "reasonable." (§ 12940, subds. (a) & (m).) Under FEHA, "reasonable accommodation" means "a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired." (*Nadaf–Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 974.) " 'Reasonable accommodation' may include either of the following: [¶] (1) Making existing facilities used by employees readily accessible to, and usable by, individuals with disabilities.

[¶] (2) Job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices . . . and other similar

accommodations for individuals with disabilities." (§ 12926, subd. (p); see Cal. Code Regs., tit. 2, § 11068, subd. (a); accord, 42 U.S.C. § 12111(9)).)

"If the employee cannot be accommodated in his or her existing position and the requested accommodation is reassignment, an employer must make affirmative efforts to determine whether a position is available. [Citation.] A reassignment, however, is not required if 'there is no vacant position for which the employee is qualified.' [Citations.] 'The responsibility to reassign a disabled employee who cannot otherwise be accommodated does "not require creating a new job, moving another employee, promoting the disabled employee or violating another employee's rights." ' [Citations.] 'What is required is the "*duty* to reassign a disabled employee if an already funded, vacant position *at the same level* exists." ' " (*Raine v. City of Burbank* (2006) 135 Cal.App.4th 1215, 1223 (*Raine*); see § 12926, subd. (p).)

Tapia provided uncontradicted evidence regarding her efforts to reasonably accommodate Garcia. She offered him several options, but he rejected them all, insisting on returning to his painter job—with accommodation—despite Dr. Bruff's explanation of the essential aspects of the job and safety problems that can result from Garcia's continued working in that position. Further, Tapia explained she was constrained in accommodating Garcia because of his not having completed high school. In light of that fact, the lab assistant position, which did not require a high school diploma, was a reasonable accommodation. On this record, Garcia failed to prove his claim CDCR violated his rights to reasonable accommodation under FEHA.

IV.

18

Garcia contends CDCR failed to engage in an "interactive process" as required under FEHA: "CDCR accommodated his work restriction for 16 years. It was granted as '[p]ermanent.' CDCR refused to discuss retaining his Painter II position and demanded he accept a [p]hlebotomist position at half pay and 596 miles away from home. This is a blatant refusal to act in good faith by CDCR."

Section 12940, subdivision (n) makes it unlawful "[f]or an employer or other entity covered by this part to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition."

" 'The "interactive process" required by the FEHA is an informal process with the employee or the employee's representative, to attempt to identify a reasonable accommodation that will enable the employee to perform the job effectively. [Citation.] Ritualized discussions are not necessarily required.' " (*Scotch v. Art Institute of California-Orange County, Inc.* (2009) 173 Cal.App.4th 986, 1013 (*Scotch*).)

In *Raine*, the defendant employer reassigned an employee police officer to a temporary light-duty position to accommodate the employee's injury while it healed. (*Raine*, *supra*, 135 Cal.App.4th at p. 1218.) The employee remained in that position for six years until his physician advised the employer the disability was permanent. (*Ibid.*) The employer told the employee it had no available permanent positions as a sworn police officer for someone with the employee's qualifications, and offered him a desk position as a civilian police

19

technician. (*Id.* at p. 1219.) The employee declined the offer, took disability retirement, and sued the employer under the FEHA, contending the employer failed to reasonably accommodate his limitations by making his temporary position permanent. (*Raine*, *supra*, at p. 1219.) The Court of Appeal, affirming summary judgment in the employer's favor, held the employer had no obligation under the FEHA to make the temporary light-duty position available indefinitely once the employer learned the disability was permanent. (*Raine*, *supra*, at pp. 1217-1218.)

In *Furtado v. State Personnel Board* (2013) 212 Cal.App.4th 729, this court addressed the case of a correctional officer at Centinela, Furtado, whose injuries to his arm caused him to lose grip strength and loss of range of motion, making it difficult for him to use a baton. (*Id.* at pp. 734, 735.) Furtado alleged discrimination because he was denied accommodation for his disability and was medically demoted. (*Id.* at p.741.) We concluded, "Furtado requested that the [CDCR] 'accommodate' his disability by either waiving the requirement that he certify with the side handle baton, or assigning him to an 'administrative' correctional lieutenant position. Furtado was not entitled to either of these 'accommodations.' Waiving the baton certification requirement would mean that Furtado would not have to demonstrate that he is a 'qualified individual' within the meaning of FEHA. Instead, it would allow Furtado to continue as a correctional lieutenant while being unable to perform all of the essential functions of the position." (*Id.* at p. 753.)

Guided by these authorities, we reject Garcia's contention the CDCR failed to engage in the interactive process. Substantial evidence showed Tapia sent him information regarding his options for reasonable accommodation. Tapia also outlined the difficulty she had finding

20

alternative placements for him.  As in *Raine*, *supra*, 135 Cal.App.4th 1215, the fact the CDCR had accommodated Garcia for a considerable length of time did not require CDCR to make that accommodation permanent.  As in *Furtado*, *supra*, 212 Cal.App.4th 729, Garcia was not entitled to an accommodation that would dispense with the requirement that he demonstrate he is a "qualified individual."

"To prevail on a claim under section 129540, subdivision (n) for failure to engage in the interactive process, an employee must identify a reasonable accommodation that would have been available at the time the interactive process should have occurred."  (*Scotch*, *supra*, 173 Cal.App.4th at p. 1018.)  Here, Garcia has not identified any other position that he could have held that would have satisfied the requirement of reasonable accommodation.

## V.

Garcia contends the court failed to "properly allow evidence, properly instruct the jury and [used a] defective special verdict form."  His entire argument on this point states:  "This jury was never allowed to hear relevant evidence, receive clear full instructions, nor given a proper special jury verdict form.  The duty set forth in California Rules of Court, Rule 2.1050 (a) and (b) was not followed by the court.  [Garcia] was severely prejudiced and his case dismissed without a fair trial.  [¶]  The trial judge conducted his own trial in a way only he conceived.  He wrote his own motion, ruled on his motion, wrote his own jury instruction[s] and wrote his own special verdict form.  Then he suggested [the] CDCR make motions it did not contemplate and he moved a key motion date to specially accommodate CDCR so the judge could dismiss the case.  How can this be considered

21

impartial and fair in our judicial system?  Every objection and correction of the law by Garcia's counsel was ignored.  The Court of Appeal is urged to restore respect for the system so disabled employees will believe they have protectable legal rights to work in the community."

Garcia in his brief has not developed his arguments with reference to applicable law; therefore, we deem this contention forfeited.  An appellant must affirmatively demonstrate error through reasoned argument, citation to the appellate record, and discussion of legal authority.  (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115-1116 (*Guthrey*); Cal. Rules of Court, rule 8.204(a)(1)(C).)  As a general rule, "[a]n appellant must provide an argument and legal authority to support his contentions.  This burden requires more than a mere assertion that the judgment is wrong.  'Issues do not have a life of their own:  If they are not raised or supported by argument or citation to authority, [they are] . . . waived.'  [Citation.]  It is not our place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness.  When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

Rule 8.204(a)(1)(C) of the California Rules of Court places the burden on appellants to "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears."  Thus, " '[t]he reviewing court is not required to make an independent, unassisted study of the record in search of error or grounds to support the judgment.'  [Citations.]  It is the duty of [appellant] to refer the

22

reviewing court to the portion of the record which supports appellant's contentions on appeal. [Citation.] If no citation 'is furnished on a particular point, the court may treat it as waived.' " (*Guthrey, supra*, 63 Cal.App.4th, at p. 1115.)

We need not examine undeveloped claims; our role is to evaluate legal argument with citation of authorities on the points made. (*Maral v. City of Live Oak* (2013) 221 Cal.App.4th 975, 984-985; *People v. Stanley* (1995) 10 Cal.4th 764, 793.) Garcia's briefing gives us no basis to conduct this analysis. None of his bare assertions affirmatively demonstrates the court erred.

In any event, to the extent Garcia claims the court erred by instructing the jury with a modified version of CACI No. 2543 regarding the criteria to ascertain the essential job duties of a Painter II, we conclude any claim of error is waived because Garcia acquiesced in the court's instruction.

At trial, this exchange took place regarding the instruction:

"GARCIA'S COUNSEL:   I have a lot of jury instructions here and I did write on my own, which is my habit. I usually write several variations of the jury instructions too.

"COURT:     Well, this again – you are correct, it's a modified form of [CACI No.] 2543, [subdivision] (a). My convention is I just start adding letters as I tweak the jury instructions. It works well that way. So if you see a letter on there, you know that's a modified instruction.
[¶] And, for instance, [CACI No.] 2543, [subdivision] (b) is an instruction that I wrote, although it comes directly out of statute. Doesn't include some stuff in the statute that's irrelevant, like – oh, I can't remember, there's only one person in the organization that could do the job and that kind of thing.
"GARCIA'S COUNSEL:   Right, like the collective bargaining agreement. I have all the statutes here, so –

23

"COURT:                    Yeah.

"GARCIA'S COUNSEL:    Okay, I'm fine with that."

Later, during closing arguments, Garcia's counsel elected to inform the jury:

"You're going to get a chance to look at the jury instructions, which will tell you a summary of the law.  The judge and the attorneys have all gone through them and we've agreed that these are the correct ones to read to you, for you to follow."

In *Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1685, we explained that " 'an appellant may waive his right to attack error by expressly or impliedly agreeing at trial to the ruling or procedure objected to on appeal.' "  Further, principles of waiver "apply with particular force in the area of jury instructions." (*Id.* at p. 1686.)  Here, in light of the fact Garcia's counsel abandoned any objections he had to the court's instruction and expressly agreed with the court's modified instruction, to the point of making an unprompted remark to the jury that all the jury instructions were acceptable to the parties, his claim of error is not preserved on appeal.

## VII.

Garcia contends the trial court improperly granted summary judgment of his retaliation claim.  He specifically contends:  "By CDCR's failure—and refusal—and shifting excuses to explain the termination decision, Garcia has shown the retaliation was more likely a motivating reason, thereby proving his case of retaliation.  [¶]  Here, Garcia sets forth a pattern of unlawful disability discrimination.  This shows a consistent retaliatory intent and causal connection between the protected activity and termination."

"FEHA makes it unlawful for an employer 'to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part

24

or because the person has filed a complaint, testified, or assisted in any proceeding under this part.' " (*Scotch*, *supra*, 173 Cal.App.4th at p. 1003, quoting § 12940, subd. (h).) To establish a prima facie case of retaliation, the employee must show " '(1) he or she engaged in a "protected activity," (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action.' " (*Scotch*, at p. 1020, quoting *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.) A causal link may be established by showing that the adverse employment action occurred shortly after the employee filed a charge of discriminatory conduct. (See, e.g., *Scotch*, at pp. 998, 1001, 1020 [finding sufficient evidence of causation where employee suffering from AIDS suffered adverse employment action (change in status from full to part time) weeks after stating in a letter and in meetings with supervisors he believed he was being treated differently because of his condition]; *Strother v. S. Cal. Permanente Medical Group* (9th Cir.1996) 79 F.3d 859, 869-870 [employee suffered adverse employment action one day after filing discrimination charge].)

While we must liberally construe Garcia's showing and resolve any doubts about the propriety of a summary judgment in his favor, his evidence remains subject to careful scrutiny. (*Scalf v. D.B. Log Homes, Inc.* (2005) 128 Cal.App.4th 1510, 1518-1519.) We can find a triable issue of material fact "if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)

25

We conclude Garcia has pointed to no evidence to support his contention that CDCR failed or refused to explain its termination decision, or that it provided "shifting excuses" about it. CDCR met its burden by showing, through correspondence between Tapia and Garcia, that the reason for the termination was Dr. Bruff's conclusion Garcia could not perform the essential functions of his job. The burden thus shifted to Garcia to show this reason was pretextual. But Garcia failed to meet his burden. He failed to submit evidence the decision to demote him had a retaliatory motive. Accordingly, this claim fails.

Garcia also claims, with no citation to the record or legal authority: "This [summary judgment motion] should never have been entertained by the trial court. It was too late, the trial had started, the statutory deadlines were over, and the evidence of retaliation at least created triable issues. Garcia deserved the chance to present his evidence and get a fair trial." This contention is forfeited because Garcia does not meet the standard for presenting an appellate argument supported by applicable law. (*Guthrey*, *supra*, 63 Cal.App.4th at pp. 1115-1116; Cal. Rules of Court, rule 8.204(a)(1)(C).)

## DISPOSITION

The judgment is affirmed.

O'ROURKE, J.

WE CONCUR:

HALLER, Acting P. J.

McINTYRE, J.